Holmes versus, or the Estate of Holmes versus Pneuma Wavex for the appellate, Mr. Simpson and Mr. Heft for the athlete, Mr. Wilder. You may proceed. May I please report, Reagan Simpson for Pneuma Wavex LLC. There are a number of issues raised in this appeal and I will gladly answer questions about any of the issues, but I will otherwise primarily focus on two issues today, the Household Exposure Issue and the Green Sheets Issue. As to the Household Exposure Issue, the question is one of duty. As the Court held in Marshall v. Burger King, duty deals with relationship, it deals with policy, it deals with foreseeability. What we are urging the Court to do is to adopt the reasoning of a number of courts that have rejected duty in household cases, particularly the Michigan Supreme Court in the NRA Certified Question case. As the Court pointed out in that case, imposing liability in a household situation can result in limitless duty. There is no principle or logical way to draw lines once you extend beyond the worker or employee to the spouse, because the logical extension of that would be a babysitter, a neighborhood laundry, a bartender, a taxi cab driver, and for that reason the Michigan Court and a number of other courts across the country have rejected recognizing the duty in a household exposure case such as the one before you now. That is particularly true in a conspiracy case, because there is even less connection and less relationship. For example, in the Olivo case decided by the New Jersey Supreme Court, the Court said at page 1149 that the duty was recognized to the spouse to the extent that the employer owed a duty to the employee. In this situation, Apex has no relationship whatsoever to an employee of UNARCO and certainly has no relationship to the spouse of the UNARCO employee. Is the Simpkins case distinguishable or is your argument we should just not follow it? The argument is that Simpkins should not be followed and the Nelson case should be followed. Nelson is a little bit different because the premises liability argument or allegation was the focus of the decision in the Nelson case. But Simpkins follows a number of cases that have found a duty, although as we point out in our brief, another reason for not recognizing a duty in this case, Justice Turner, is the foreseeability issue. Simpkins didn't deal with foreseeability because it was on a motion to dismiss basis. So another prong in our no-duty argument is in this particular case, where you have exposures that ended in 1963, there also should be no duty on the specific facts of this case because of lack of foreseeability. I think in looking at the general reasons why there should be no duty, limitless liability, extending it to a conspiracy case, even expands the limitless nature of the liability. If you look at the gist of the conspiracy pleaded in this case, as instructed by the court in this case, is the failure to warn workers and the failure to warn product users. When you begin to extend conspiracy liability beyond those two categories in the jury's instruction, then you go very far afield and you end up with the possibility of extending conspiracy liability to the entire society. You can make the argument that if Johns Manville had argued, had warned in 1950, then there would be generations of people who would not have been exposed to asbestos. And that is simply taking it too far. And in this case, we think that there should be no duty in a household exposure case because of the policy reasons and the lack of relationship between the plaintiff and, in this case, the alleged conspirators. In addition to that, let me talk about the green sheets, which is an issue that we seek a new trial on. The green sheets were publications that contained in the Asbestos Workers Journal from 1969 to 1975. It's undisputed that Johns Manville was a sponsor and partially financed the insulation industry hygiene research program along with the union. The green sheets, which are at the very last volume of the record, Apex exhibits 500 in that particular volume and on, 527, are replete with a number of comments about the health hazards of asbestos. In the spring 1969 green sheet, Mr. Bradshaw of Ovens Corning in the spring 1971 green sheet. Simply put, if you're being accused of a conspiracy to hide information about asbestos, the last thing you're going to do is bankroll the publication that talks a little else than the health hazards of asbestos and how to eliminate those. That's at least circumstantial evidence that there is not a conspiracy at that time. McClure says you cannot have a conspiracy purely based on parallel conduct. So the plaintiff has the obligation to put in plus factors. The defendant, on the other hand, should be entitled to put in minus factors. And this is one of the minus factors that one of the alleged conspirators, two of them actually, are working together with unions to talk about, to sponsor, to be part of, to be on advisory council of a publication that reveals and discusses the hazards of asbestos. Courts that have considered this, the Hartman case, I believe, is cited by the plaintiff on this point, but that's a notice issue. The question in that case was whether there was a notice to someone by virtue of the green sheets. Notice is not the issue in this case. We did not ask to put in the green sheets for the purpose of notice. We asked to put them in because they're inconsistent with the allegation of conspiracy. And there's actually a fundamental flaw if you apply notice analysis, and this is why. Notice to the plaintiff is a concept that adheres to situations in which you have an independent duty to the plaintiff. Did you warn the plaintiff and what did the plaintiff know? Now courts so far in asbestos cases have rejected, although we argue for a requirement of independent duty from the alleged conspirator to the plaintiff. But if you adopt the notice concept to exclude the green sheets, then it's inconsistent to say there's no direct duty analysis that applies to the liability equation. So notice is not a proper grounds for excluding the green sheets unless you want to accept the proposition that there needs to be an independent duty, in which case there should be no duty at all in this case because ABEX has no independent duty to the plaintiff. But the bottom line I think of the green sheets is that it's circumstantial evidence that alleged conspirator is doing something inconsistent with conspiracy and therefore it should be admitted into evidence. One other topic I'd like to cover briefly, and that deals with the jury instructions in this case. There's two of them that I would like to mention. McClure says at pages 143 and 144, civil conspiracy extends for someone who did not act but who only planned, assisted, or encouraged an over-act. That connotes a requirement of a substantial relationship between the conspiracy and the harm for which recovery is sought and the conduct of the conspirators in the harm for which recovery is sought. In fact, that's what the court said in Papel v. First National Bank of Shawneetown at page 955, quoting Prosser, that there needs to be a substantial relationship between, in that case of conspiracy, the fraud and the harm. That concept is not in the definition of conspiracy that was plaintiff's instruction number 16 that was given to the jury. Instead, that instruction says the conspirator doesn't need to plan, doesn't need to know about the alleged acts that caused the harm. And it's also inconsistent with the court's decision not to submit sole proximate cause. The jury was entitled to know that they could find for the defendants in this case if they determined that the conduct of UNARCO would have occurred regardless of whether a conspiracy existed. That's the purpose of sole proximate cause and that's supported by the language in McClure that connotes the requirement of a substantial relationship between the conspiracy itself and the harm and in the Abel case which held also that in that case there was no substantial relationship and no causal connection. So those are the reasons that I plan to address the court today. If there are any questions about those, I'll be glad to answer questions or any questions about other issues that we have brought forward. Good morning. May it please the court, I'm Steve Haft. I represent Honeywell. I would like to talk with the court first about the trial court's decision in this case to exclude from evidence the evidence we offered about parallel conduct with people who were not accused of being part of the conspiracy. The plaintiff's key evidence in this case is that a small group of companies supposedly knew about the hazards of asbestos, kept using and selling asbestos and asbestos-containing products and didn't warn people, customers and employees. They put in a lot of evidence about that parallel conduct. They kept saying the issue was when did Bendix know and when did it coincidence this small group all allegedly acted in the same fashion. And they asked the jury to infer from the fact that this small group acted in the same fashion that there must be an agreement. That was the evidence of an agreement. Evidence of an agreement. We offered evidence through the plaintiff's own expert, Dr. Kassman. Dr. Kassman was brought in by the plaintiff to explain what companies knew and what they did. That's his field of expertise. And we made an offer of proof after the judge denied us the opportunity to present this evidence to the jury. And it's found in the record at C, 1846 to 1855. And in that testimony that we wanted to get before the jury, Dr. Kassman agreed that there were hundreds of companies making asbestos-containing products. He thought most of them knew before 1960 that asbestos was dangerous. He gave specific examples of companies who knew before 1970 that asbestos was dangerous. He gave General Motors, Chrysler, DuPont, General Electric. And then he expanded the universe to companies that used asbestos-containing products. There were thousands of companies that used asbestos-containing products. He said that he thought most of those companies, the big companies, they also knew about the hazards of asbestos. He gave his examples, Texaco, Standard Oil, Westinghouse, Georgia Pacific. They all knew, used, and didn't warn their employees. He also testified that many of these companies that knew and used and didn't tell also bought their asbestos from Johns Manville as the defendant. And that they had communications with Johns Manville to offer proof he submitted. There were meetings where these other companies went with Johns Manville to talk about the hazards of asbestos. And then I asked him the question, he was asked, isn't it true that none of the thousands of companies that made or used asbestos-containing products put any warning on those products prior to 1960 that they were harmful? That's right. So Bendix acted just like the thousands of other companies who made its own asbestos-containing products with respect to warnings. That's correct. In this case, evidence was put into Bendix and its advertising didn't say anything about the hazards of asbestos, as did this small group. He testified the same, that these thousands of companies did not put a warning in their advertising. And so Bendix acted just like those thousands of other companies when it came to putting a warning in advertising. One of the things that we are criticized of in the case is that Bendix didn't give its employees a sane appreciation of the risk, didn't warn the blue-collar workers of the problem. Dr. Castman would testify that these thousands of other companies likewise did not warn their employees, did not give them a sane appreciation of the risk. And that Bendix acted just like them in dealing with its employees. He goes on to talk about the United States government. It knew since 1918 that asbestos was hazardous. And in 1935 it had a study done. And at each point in the line where the government knew, it kept using asbestos-containing products it did not warn. The same is true of state governments. So what we had in this case was, for circumstantial evidence, the plaintiff came in with a small group and said to the jury, look only at that small group. When you see they act like, that can't be a coincidence that this small group was acting like. We wanted to show it's a much bigger group. Many, many times bigger, including the United States government and the state governments and all other governments acting in exactly the same way. Why is that important? If you look at McClure and the Innocent Construction Rule, if you're going to infer that our should be entitled to put on the evidence of all these other companies we were like, who are not alleged to be conspirators. Yet our conduct is just like them. Our conduct could be innocently considered to be like this large group of non-conspirators, as opposed to the small group defined by the plaintiff. The Nolan case said that we're entitled to have a rational alternative explanation for the jury. This larger group of companies and governments who acted just like we did is our alternative rational explanation for why we're not part of a conspiracy. We were not allowed to put it in. The trial judge apparently accepted the argument that in a case where you're found guilty of negligence or found guilty of conspiracy, you can't say but there are other companies who also were negligent or conspired and they caused the injury. That's not the purpose for which the evidence was offered. We're not saying these other companies were part of a conspiracy. They weren't. We're saying our conduct was like innocent parties, not like someone else was guilty. The Nolan court made clear that a piece of evidence, such as the conduct of another party, may be inadmissible for one purpose, such as blaming them for being negligent, but it is admissible for another purpose. In Nolan, it was for the sole proximate cause. In our case, it's to show our conduct was consistent with the conduct of thousands of innocent people. When you're dealing with circumstantial evidence, in the McClure Innocent Construction Rule, the trial judge's exclusion of that evidence was error. Now, I understand points made by the plaintiff. One is that we're arguing the government should have enacted legislation. It's a red herring. We're not arguing about government legislation. We're saying the government was one of the biggest employers that we have. The government used a lot of asbestos. The government, knowing it was hazardous, did not warn their employees. So we're not pointing to the government as a governmental entity. We're saying it's just another group, a large group, of employers who used asbestos, knew it was dangerous, and didn't warn. We were just like them. The plaintiff says, well, we're going to have to have a bunch of mini-trials on what these other companies did. Their own expert in 10 pages of transcript gave it all to us in another case. We don't need a lot of mini-trials. We have Dr. Casselman's testimony that thousands of other companies acted exactly like Bendix did. And finally, the plaintiff, in his brief, acknowledges that the conduct of others is related to the parallel conduct of these companies. The plaintiff writes, there might be some merit to the defendant's argument if all the plaintiff relied on was parallel conduct. But they said because they had more than parallel conduct, somehow we lose our right to bring in our evidence of parallel conduct. So the idea is that if they tried to prove the case only with parallel conduct, they agree we can bring in parallel conduct of others to show the inference should not be drawn. But if they prove a little bit more, our right to defend ourselves evaporates. If I were a trial judge, I would be interested in how those other companies used asbestos, and if I'm just listing, how are you more like General Electric than you are dissimilar from General Electric? We talked about General Electric, and General Electric made asbestos-containing products, just like Bendix made asbestos-containing products. General Electric sold them, according to Dr. Casselman, knowing that there was a hazard of asbestos, and in fact, I believe there's even examples of meetings between GE and General Motors, or GE and Johns Manville in the record, where they talked about it. So it's the same principle that permeates the entire case. These companies knew, sold, and didn't warn the employees using it, and didn't warn their customers. And it's the same conduct, which they say, for us, is strong evidence of conspiracy. If there are no more questions at that point, we have a number of other arguments. Some are simple and don't merit argument, and some are more complex and more than the time I have left. I would simply ask two things. First, with respect to the admission of hearsay in this case, the evidence the trial court cited to admit hearsay was less than what this court said was not enough to admit hearsay in the Dukes case. And secondly, with respect to the JNOV, respectfully, we think if you look at the evidence in this case, and compare it to the evidence the Supreme Court said in McClure was sufficient for JNOV for a defendant, it's the same evidence in the sense that there was evidence of relationships, there was evidence of association membership, there was evidence of sales. The Supreme Court said such evidence of opportunity to agree or evidence of communications, that is not enough evidence to prevent a reasonable inference of conspiracy. And we agree with that. We agree with the court's decision in Dukes as far as excluding, not allowing hearsay based upon the record made in that case. And we think we should give judgment to JNOV. Thank you, counsel. Thank you. Mr. Wiley? Good morning, Jerome, for the plaintiff. Not surprisingly, I'm asking that you affirm the verdict on behalf of the Holmes family. There are a multitude of errors alleged, and other than questions, I'll restrict myself to what they raised, since those apparently are the ones that are of some importance to them, or more important than the others. Taking the last two first, Honeywell just said that the evidence in this case by which the court admitted hearsay was less than that was presented in Dukes. That's incorrect. Everything, basically everything that came to Dukes, which was tried and in which your decision came out in October 2008, all of that evidence was again in this case, plus additional evidence. In fact, this was a trial that was tried post-Dukes of Health Court opinion. And the court followed the precepts, I guess you would say, of Dukes, in that initially a lot of the evidence was admitted on a limited basis as to one party or the other, and it was only near the end of the plaintiff's case in chief. I think it's February 26 transcript, page 158, where the court then considered, based on everything it had heard up to then, whether or not it was going to allow evidence that had previously been admitted on a limited fashion, whether it was going to allow that now generally to be considered. And that was because of what you said in Dukes about admission of hearsay evidence from other alleged conspirators. And the court had before it at that point not only what you had at Dukes, but it had additional evidence that had been discovered in the roughly four years since the Dukes case had been tried back in the fall of 2005. Additional evidence such as the shared director between Bindex and ABEX back in the 1930s, sales by Bindex to ABEX, the brake linings, and so on. So this court had more than was present in Dukes. It considered everything in Dukes plus the additional record and decided hearsay evidence would be admitted generally at the end of the case. The court certainly had at that point evidence that would support direct evidence, that would support conspiracy. I asked you, for instance, ABEX, because at that point we'd already put in the evidence that this court found in Burgess I and Burgess II was evidence of agreement. In Burgess II, this court discussed the fact that ABEX returned the Saranac Draft to the Manville attorney and prior to that asked that Manville act for ABEX. Those were Exhibits 360, A and B, and 361 and 362. This court in Burgess II, even post-McClure, said that would support an agreement and tortious conduct in furtherance of an agreement between Johns Manville and ABEX. And this is a case where the exposure involves not only employment at UNARCO, but the UNARCO plant is one where there was evidence that Johns Manville fiber was used. This isn't discussed by ABEX in its brief. Johns Manville fiber was used. So it's really three of the alleged conspirators to which Don Holmes had exposure, which he then took that dust home. Those are three companies that were part of the Saranac agreement, just as ABEX was. The second thing on judgment in OB, Honeywell just said that there's less evidence here than what the Supreme Court found in McClure. And again, I would disagree. There's more evidence as to not only the defendants who were at issue in McClure, Owens-Illinois and Owens-Corning, which this court recognized in the Duke's opinion, but there's everything that was in Dukes where he denied judgment in OB, plus additional evidence post-Dukes. Now if we sort of jump to the start, household exposure. ABEX says that, well, it could be limitless. It could be the cab drivers, the babysitters, the bartenders, if you extend exposure to the spouses. And there is a dispute, there is a disagreement among the cases on this point. But that disagreement, I think, revolves primarily around foreseeability. And Illinois is a state that considers foreseeability. The Simpkins case considered foreseeability. Simpkins was not a conspiracy case. The Nelson case in the Second District was not a conspiracy case. I think Nelson is readily distinguishable because, for whatever reason, in the Nelson case, the plaintiff chose to go forward only on premises liability. In fact, the Nelson court repeatedly says, you know, all you've alleged is premises liability. And the plaintiff apparently then started citing non-premises cases. And the court at one point says, you know, it might be you could prevail on, the plaintiff might be able to prevail on some other theory, but we're restricted to this theory, which is premises liability. Simpkins was a negligence case. Simpkins concerns the employer's duty to tell the employee. I don't see a distinction, meaningful distinction, between Simpkins and this case because it's true, this is a conspiracy action. If it's shown that there was a conspiracy, and if Avex, and for that matter Bindix, are responsible in the conspiracy law, then from Adcock on, both the appellate court opinion and the Supreme Court opinion, the acts of Unarcho, or for that matter the acts of Johns Manville in failing to warn, or Augustus in failing to warn, are the acts of the other conspirators. And the idea that the conspirators would have to know about those acts, and this gets back to the argument, I guess, on the jury instruction, Plaintiff's Instruction 16, that's expressly contrary to what the Supreme Court said in Adcock at page 65, where it said you need not have known about the injurious action if that action furthered the overall object of the conspiracy. And so that is in the instruction. That's because that's been a principle of law from at least the Supreme Court decision in Adcock, and I'll be honest, I don't remember if it was in the appellate court decision or not, but the Supreme Court expressly said you need not have known about the acts in order to be found liable if the act furthered the conspiracy. Plaintiff's Instruction 16, which Apex referenced, is an instruction which has previously been reviewed by this court. It wasn't reviewed in Dukes because you didn't address jury instructions, but it was reviewed in Van Winkle, and the only difficulty that the Van Winkle court found with it, and it's probably Justice Steigman's opinion, was it didn't expressly say that a conspirator was only liable for acts committed after injury of the conspiracy. But the rest of that language was there in Van Winkle, and it's been there in every case since, whether it be the Burgess case, the McClure case, the Dukes case, and in this case. Going back to the household duty, as to foreseeability, the evidence in this case, first of all, the idea of you have to draw a line somewhere, I would disagree with. I remember, I think about 20 years ago, Justice Green in the old place saying, because there was an issue about how long had somebody been exposed to, I remember him looking out the window, which is where he always seemed to sit unless he was presiding, and steepling his hands and saying, well, Mr. Wouter, would one day be enough? And I said, probably not, but I don't know. That's why we have trial courts. They hear the evidence and what the medicine was, and they decide. And I guess conceivably one day, if that's what the record reflected, then that's what ought to occur. The same thing here. Maybe it's a cab driver. I don't know. This isn't a cab driver case. This is a spouse. It is foreseeable a spouse will wash her husband's clothes. It is foreseeable that dust can't come home. And this record supports the idea that it was foreseeable before Don Holmes went to work in Narco. He went to work in 1962. There's evidence in this case, testimony, that in 1913, Safety Magazine talked about keeping the dust in the workplace so that the poisons aren't taken into the lunchroom and taken home. In 1924, there was a text, Industrial Hygiene, that basically said, again, you need to provide changes of clothing, you need to provide showers, so that the poisons and dust are kept in the workplace. There was a government manual in 1943 along the same lines. Mesothelioma cases were reported in 1943 for the first time in the German literature, more in the 50s, and by 1960 it was established with an article out of South Africa by a doctor named Wagner, or Wagner. And one of his cases was the daughter of somebody else who had worked, who had also contracted mesothelioma. The defense expert in this case, Dr. Dyson, is somebody who's testified since 1993 for a specialist defendants, and he's prepared little bibliographies. He has one, Bibliography of Household Exposure Cases. The first item he lists is the Wagner article from 1960. That predates Don Holmes' appointment by two years. I don't agree that in order for something to be foreseeable, you have to foresee the exact type of cancer, and the exact group of people that cancer will occur in, if you know, number one, you've got a cancer causing dust, number two, you don't know the safe levels, and number three, people are being exposed. And all those things are shown in this record. That AVEX knew, as an example, by 1948, where its medical director is returning the report from Saranac, asking the Manville Attorney to act for them, since it seems he's concerned with legal repercussions, or repercussions from a legal point of view. So they knew it could cause cancer, and they also had received an outline in 1943 from their own researchers, saying the quote, recommended level is probably unsafe. That's in Plains Exhibit 408, page 10, that it's unreliable. So I think it was, one, foreseeable, and two, it is not in a great expansion of liability to say that a spouse is going to wash a resident's clothes. That's what the legal court said, that's what the Supreme Court said. I guess we'll see what the Illinois Supreme Court says, because as I understand it, the PLA has been accepted. On the green sheets. I don't believe that, Mr. Wilder. Didn't one of the experts concede that the first study demonstrating bystander exposure was not published until 1965? The first epidemiological study on families is the Newhouse and Thompson study out of Great Britain in 1965. Now, the Wagner study contains a case report. It's case number 15, who was the daughter of case 22. There are other reports. When we say bystander, though, Justice Turner, that gets back to, I mean, if you go back 30 years, people try to say, well, it's only the guys who worked hands-on with it. Well, there were actually indications of bystander disease, not necessarily wives who had been studied, but bystanders, Dr. Kasman testified about, clear back in the 1930s, clerical people in factories who never worked hands-on with it or were otherwise exposed. But the first epidemiological study isn't until 1965. Although there are case reports before, although there are nonspecific asbestos texts before about taking poisonous dust home. Do you have to have an epidemiological study before you can foresee that there's going to be a risk? I would suggest you don't, under Illinois law. In the Donaldson case, the Supreme Court, I believe, said the expert's opinions were admissible and could support a verdict, even though there was no epidemiological study in those cases coming out of Taylorville. So the defense, there's no question, the defense says we've got to have an epidemiological study. It's got to have one of wives. I assume they'd say we need one of daughters and probably sons would potentially be different, even though they all grew up in the same household. But there was evidence pre-'62, going back almost 50 years, that you don't take poisonous dust home. And in terms of, again, going back to ABEX, I mean, they put in evidence in Exhibit 162A, I believe it was, an ABEX exhibit, that talked about having showers at one of the workplaces. It wasn't an asbestos plant, but at one of the workplaces for the workers. An ABEX representative would take care of the families of workers. We put it in Plains Exhibit 202, where they showed how they take dust counts and do x-rays and how Andy and his wife Mary Jean and Andy Jr. can enjoy peace of mind. ABEX put in ABEX Exhibit 150, and I don't know that that got cited in the briefs. It's in the record, but we all just finished a five-week case last week. And so, look, ABEX 150 is in this case. It's about the nursing program from 1947, and it talks in the last page about how they take care of the workers and their families, including even taking the wives, if necessary, to the doctors so the worker will have peace of mind. So there's sort of a difference between there and what ABEX is arguing today. If I could go to the green sheets briefly. The green sheets start in 69. There was no prohibition against the defendants putting in evidence if they'd chosen to do so that John's Manville provided some of the funding for the green sheets. But the content of the green sheets, they were edited by Dr. Selikoff. They got some funding from John's Manville, but it was Dr. Selikoff who decided, and his staff, Dr. Nicholson, who were the editors, and decided what information would be put in the green sheets. Counsel said, well, it shows Mr. Joe of John's Manville talked about hazards. Well, there's an article about him, and the only word he uses is hazards. Bradshaw in 71 for Owens-Corning in this court, I think all three of you at this point have been on asbestos. I know you've all been on asbestos cases, Dukes being the most recent, because you don't look like Justice Pope, despite what the name tag says. Owens-Corning knew going way back, they were worried about the government blowing the whistle in 67. When Bradshaw spoke in 71, and it was to a group of contractors, he talked about respiratory and lung congestion. And I kept offering, if they can find Owens-Corning or John's Manville, even a quote from them where they talk about asbestosis, cancer, and mesothelioma, it should be admissible. It's not in the green sheets. John's Manville provided some funding, and the purpose of the study was allegedly going to be better engineering practices. Selikoff ran with it on his own, here from the green sheets, and started giving out information. And if you look at the briefs, they argue about, as an example, there's a photo of Vice President, John's Manville Vice President Punzack, that appears right next to an article by Selikoff about the stuff causing cancer. Now, I keep hearing, I can't prove guilt by association, but they apparently want innocence by the fact that somebody decided to put his photo next to the article by Selikoff. It's the same Punzack who's the speaker in Punishers Exhibit 330, where he tells, when OSHA's going to be passed, where he argues you can't put cancer on the label, it will scare and terrify people, and it will have an undeserved economic impact on the industry. That's in March of 72. So the idea that his photo happens to appear next to an article, I mean, the jury, there's no support that he somehow, as he's pictured there, is adopting what's in the article, which there's no indication he ever saw. The last item is the parallel conduct argument by Bendix. This court in McClure, at the appellate level, said that it would seem you could prove a conspiracy merely by parallel conduct if there was strong enough evidence. That's what Justice Cook said in McClure. The Supreme Court in McClure said, nope, it takes more than that. It takes more than just parallel conduct. There's a burden on the plaintiff to come up with other evidence. And that's why we argued as we did, if parallel conduct is not enough by itself, then it wasn't that we chose to put on additional evidence or direct contacts, it's because that's required of Post McClure, as this court recognized in Burgess too. So if we could have proved it just by parallel conduct, just say you eight knew and you eight didn't tell, if that was enough, then I think there would be a merited position of, well, other people knew and didn't tell. But we put on, and I think there is some mischaracterization of the record in our arguments, said it wasn't a coincidence because of the additional conduct that was shown, the additional exhibits. Counsel says, well, there's hundreds and thousands of companies. It will require a mini-trial to see what information they received from Johns Manville and what judgments they made with it and what contacts they had. There were hundreds and thousands of companies in the Inspective Study Committee in September of 1971. That's referenced in Claims Exhibits 755 and 462A, the minutes, which are 462A. There were six members. Four of those members were Johns Manville, Raybestos, Avex, and Bindix. And those four members, it was headed by a guy from Raybestos, they concerned themselves with the problems in September of 1971 that were facing the industry. Those problems included the fact that the Illinois Pollution Control Board was proposing a ban on asbestos brake linings. And at the bottom of the first page, it talks about another potential problem, which is spray-on asbestos legislation. There's been legislation to ban spray-on asbestos insulation, local legislation, which poses, in the words of the memo, a problem. And their response is, you know, how to deal with these problems facing the industry. And that's in 1971. It shows not only contacts, but it also shows there's a smaller group. The jury was instructed, according to McClure, in Instruction 16, that parallel conduct could be considered as circumstantial evidence of conspiracy, but parallel conduct by itself alone would not be sufficient in support of finding a conspiracy. So they knew that they needed to receive more than that, and they did receive more than that from the plaintiff, pursuant to the directives of McClure. We're asking that you affirm there's probably 75 more claims of error in the briefs, but I won't address any of them unless somebody has a question. This case was tried post-duce. Ernie Martin and the price-fixing never got mentioned. The court allowed stuff in initially on a limited basis until the trial court was satisfied there had been sufficient showing to allow admission of the evidence from the other conspirators. It was instructed, the same as the prior decisions, which this court has reviewed, in terms of the instructions on the principles of conspiracy and on the 1204, or Approximate Cause Instruction,  if the jury finds that a defendant acted wrongfully and its wrongful conduct was a cause and when the only allegations are conspiracy and it's against companies who did not employ or supply the products, then if Ynarko or somebody else acted independently, then the plaintiff will lose on the first paragraph because the jury will not have been able to find that the conduct of these defendants was approximate cause and that it contributed to the plaintiff's, in this case, death. If there are no questions, I'll sit down. Thank you. I'll try to make five points fairly quickly. First of all, all of the issues that we're raising are important. I have to budget my time, obviously. We do believe that under additional evidence that has been presented in this trial beyond the Burgess opinions that the Innocence Construction Rule means that there is no proof of a conspiracy. Let me talk about the duty issue very quickly. I disagree with Mr. Wilder. You do have to think about drawing lines and I refer the court to footnote 17 of the Michigan opinion by the Michigan Supreme Court saying when you're determining whether to recognize a duty, you do have to look at the ramifications. You don't look at just this particular case, but you look at the ramifications from a common law perspective of whether this is a duty that should be recognized, realizing that courts have to apply duties similarly to similarly situated persons and not to differently situated persons. So there has to be some line drawing here. As to the foreseeability issue, you're correct, Justice Turner, that Newhouse and Thompson published in 64, presented at the New York Academy of Science in 64, published in 65, presented at the New York Academy in 64, was the first study that said there is epidemiological evidence of household exposure. Wagner dealt with a situation of people who literally lived on top of a presidolite mine in South Africa. The case 15 is an environmental slash household type exposure. I think the best way to explain it is in 1962 and 1963, the standard, the guideline, was 5 million particles per cubic foot. You can argue that maybe it should have been a little bit less than that because there were some questions about it. But there is no proof in this record that anyone back in 1962 and 63 thought that you'd get anything close to 5 million particles per cubic foot in a household situation and therefore the risk was not foreseen. It has to be an objectively foreseeable risk as the Knost case says, not just some possibility out there. In this case it was not foreseeable. As far as products, the Rohrbaugh case says you also have to have foreseeable users involved. I go back to the fact that the gist of the conspiracy as pleaded here and as instructed to the jury deals with workers, failure to warn workers, and failure to warn those who purchase products, neither of which does a plaintiff fall into in this category. As far as the green sheets are concerned, in this situation just proving funding of the green sheets doesn't mean anything unless you have the contents of the green sheets. Continued funding of the green sheets from 1969 to 1975 where the green sheets are replete with discussions of the hazards of asbestos is at least circumstantial evidence that there is not a conspiracy going on. In a case where the proof by the plaintiff is circumstantial evidence and where the plaintiff's burden is clear and convincing evidence then at the very least it's circumstantial evidence that the defendant is entitled to put on that the alleged ringleader of the conspiracy was in fact participating in funding, showing up as on the advisory council of publication after publication after publication for a number of six years that were talking about the hazards of asbestos. So for that reason the case should be reversed for a new trial if the court decides that the new trial is warranted. We think that there is no duty in this case. We also think there is no evidence of conspiracy. Thank you. One other point if I may just quickly. In Simpkins it was a motion to dismiss. So as the motion was   issue of foreseeability. So that's why I said earlier that there was no issue of foreseeability in the Simpkins case because it was a motion to dismiss and therefore pleading of foreseeability was taken as true. First with respect to the parallel conduct of third parties again the plaintiff's argument is if all we prove is parallel conduct you can put in evidence of parallel conduct of others but because we've pleaded more we proved more you lost your right. No court holds that. They still rely heavily on parallel conduct as evidence of conspiracy. We're entitled under McClure to the innocent construction evidence, under Nolan to the innocent construction evidence. We should have been allowed to put that in. On the point of whether or not the court properly admitted hearsay here's what happened. In this case the trial court asked what evidence do you have currently of independent non-hearsay evidence of conspiracy. These are four things cited. The 1969 letter from Johns Manville about warnings that was in Dukes and that was held not to be enough. The silicosis letters where Bendix and Dr. Lanza talked about silicosis that was in Dukes that was held not to be enough to let in hearsay. The two things that were different the only two things that were different was ABEX sold breaks to Bendix. In the Dukes case Johns Manville sold asbestos to Bendix. A commercial transaction. That was not enough in Dukes. It's the same evidence. And finally they cite the fact that ABEX and Bendix had a common director. Well in Dukes that was part of the court's decision. It said that wasn't enough to let it in when Johns Manville and Bendix had a common director. And in McClure if you recall there was an ownership interest between Owens Illinois and Owens Corning. The Supreme Court said that's a tangential relationship because it doesn't run to someone like Johns Manville. Well in this court in Dukes it said that the relationship between Bendix and Johns Manville through a common director is not enough. Certainly the same relationship with ABEX is what the Supreme Court said would be more tangential and wouldn't support it. So if you look at the evidence in this case, not statements about evidence, you look at the evidence and it's lesser quality than it was before this court in Dukes. Thank you for your attention your honors. Have a good